COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-285-CR

 

 

ISAUL REYNA                                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 213TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In three points, Isaul Reyna asserts ineffective
assistance of counsel during his trial and subsequent conviction for engaging
in organized crime, and in a fourth point asserts error on the part of the
trial court in admitting certain jailhouse correspondence written by him.  We affirm.








II. 
Background

This is the case of the shootout after the OK
Corral.  The evening following Christmas
2003, three young people went to the OK Corral Dance Club.  As they left to return home around 12:00
a.m., Eric Campa was driving, Christina Cigala was in the passenger seat, and
Raul Ataide sat in the middle of the front seat.  As they drove down Hemphill Street, the
occupants of a grey or silver Alero fired shots at their car, and a shotgun
blast struck Cigala in the head.  Campa
drove to Cigala=s house and called 911.  By the time help arrived, Cigala was no longer
breathing.  Ataide later testified that
there were no words or signs exchanged between the occupants of their car and
the grey car, and no one in their vehicle had fired a firearmCall of
the shots came from the grey car.








Officer Weldon Thompson observed that at least
four shots were fired into the pickup driven by CampaCthree
small caliber bullet holes in the passenger door and a large hole in the
passenger window.  He recovered a shot
cup from a shotgun shell on the ground next to the truck where it
apparently  had fallen when Cigala was
removed from the passenger seat.  He also
recovered three Aprojectiles@ from
the vehicle that were CCI brand .25 caliber bullets, all coming from the same
.25 automatic pistol.  He also located a
shotgun cap and a .25 caliber shell casing from the scene of the shooting in
the 3600 block of Hemphill.  A .25
caliber shell casing was located under the driver=s seat
that came from the same pistol as the shell casing found at the scene of the
shooting.

A Crime Stoppers tip led the police to
investigate Reyna, who had been issued a traffic ticket driving a gray Alero
and who was accompanied by Erika Cerda. 
The police subsequently located the vehicle, obtained a search warrant,
contacted Cerda (who owned the Alero), and took Cerda=s
statement that implicated two additional suspects in the shooting.      

According to Cerda, on the evening of the
shooting, she went to the home of Luis Gongora, after which she, Reyna,
Gongora, Richard Maldonado, and another individual known as AFino@ drove
to the Riverside neighborhood in her Alero. 
Following a disagreement between Maldonado and Fino, the group dropped
off Fino and returned to Gongora=s
home.  Maldonado, who was still unhappy
with Fino, said he was going to Asmoke@ Fino,
which means shoot him, and asked Gongora, AWhere
are the rounds?@ 
Cerda saw Maldonado with a box of shotgun shells and then went upstairs
and fell asleep at Gongora=s house,
awakening around 1:30 a.m. to find that Reyna, Gongora, Maldonado, and her car
were gone.  They returned around 3:00
a.m.          








An executed search warrant of Gongora=s house
yielded, in part, two boxes of 12-gauge shotgun shells containing No. 7.5
birdshot, the same approximate size shot (No. 7.5 or No. 8) removed from Cigala=s
body.  Also recovered were 12-gauge
shotgun shells that contained shot cups consistent with the brand and size of
the shot cup that Officer Thompson found beside Campa=s
pickup.  The police did not discover any
.25 caliber ammunition or shell casings. 

Dylan Griffith, a gang member, testified that
three days after the shooting, Reyna and Gongora came to his house driving a
silver car and told him that they had Ashot at
some rats,@ meaning members of a certain
rival gang, on the south side.  According
to Griffith, Reyna said that after a female in a pickup truck exchanged gang
signs with them, they stopped their car and retrieved a shotgun from the
trunk.  Reyna then drove with Gongora in
the passenger seat and Maldonado in the back, and they pulled up beside the
pickup and shot at it.  Griffith was
shown the shotgun but refused to keep it and was also told that Reyna was
driving his girlfriend=s car at the time of the
shooting, which was the same silver car Reyna drove to Griffith=s
home.  He also testified that he saw the
shotgun again at the home of another gang member where Gongora and Reyna had
taken it. 








Yolanda Martinez testified that she received a
late night phone call from Reyna in December of 2003 asking that she come pick
him up along with Gongora and Maldonado because they had killed someone the
night before.  She refused.  Reyna subsequently told her that on the way
to a drive-by, they had Agot into it with another gang
and . . . [a] girl throwing up gang signs to [them].@  Gongora had told him to Aroll up@ on
them, and Gongora and Maldonado did the shooting.  At trial, there was also extensive evidence
that Reyna, Gongora, and Maldonado were gang members and testimony that Cigala
had a family member in a rival gang.

A jury convicted Reyna of engaging in organized
crime as a member of a criminal street gang, sentenced him to life in prison,
and assessed a fine of $10,000.

III. Ineffective Assistance of Counsel

In his first three points, Reyna asserts that his
trial counsel was ineffective (1) by failing to have the voir dire examination
recorded; (2) by failing to move to suppress the fruits of the search of the
Alero; and (3) through the Acumulative
effect@ of
trial counsel=s errors.

A. Standard of Review








To establish ineffective assistance of counsel,
appellant must show by a preponderance of the evidence that his counsel=s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel=s
deficiency, the result of the trial would have been different.  Strickland v. Washington, 466 U.S. 668,
687, 104 S. Ct. 2052, 2064 (1984); Salinas v. State, 163 S.W.3d 734, 740
(Tex. Crim. App. 2005); Mallett v. State, 65 S.W.3d 59, 62-63 (Tex.
Crim. App. 2001); Thompson v. State, 9 S.W.3d 808, 812 (Tex.
Crim. App. 1999). 

In evaluating the effectiveness of counsel under
the first prong, we look to the totality of the representation and the
particular circumstances of each case.  Thompson,
9 S.W.3d at 813.  The issue is whether
counsel=s
assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland, 466 U.S. at 688-89,
104 S. Ct. at 2065.  Review of counsel=s
representation is highly deferential, and the reviewing court indulges a strong
presumption that counsel=s conduct fell within a wide
range of reasonable representation.  Salinas,
163 S.W.3d at 740; Mallett, 65 S.W.3d at 63.  A reviewing court will rarely be in a position
on direct appeal to fairly evaluate the merits of an ineffective assistance
claim.  Thompson, 9 S.W.3d at
813-14.  AIn the
majority of cases, the record on direct appeal is undeveloped and cannot
adequately reflect the motives behind trial counsel=s
actions.@  Salinas, 163 S.W.3d at 740 (quoting Mallett,
65 S.W.3d at 63).  To overcome the
presumption of reasonable professional assistance, Aany
allegation of ineffectiveness must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness.@  Salinas, 163 S.W.3d at 740 (quoting Thompson,
9 S.W.3d at 813).








The second prong of Strickland requires a
showing that counsel=s errors were so serious that
they deprived the defendant of a fair trial, i.e., a trial whose result is
reliable.  Strickland, 466 U.S. at
687, 104 S. Ct. at 2064.  In other words,
appellant must show there is a reasonable probability that, but for counsel=s
unprofessional errors, the result of the proceeding would have been
different.  Id. at 694, 104 S. Ct.
at 2068.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  Id. 
The ultimate focus of our inquiry must be on the fundamental fairness of
the proceeding whose result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

An appellant claiming ineffective assistance of
counsel at trial must identify the allegedly erroneous acts and omissions of
counsel.  Strickland, 466 U.S. at
690, 104 S. Ct. at 2066.  The appellate
court then determines whether, in light of all the circumstances, these
identified acts or omissions were outside the wide range of competent
assistance.  Id.

To determine whether trial counsel was
ineffective, counsel=s performance is judged under
the law which existed at the time of trial. 
Ex parte Akhtab, 901 S.W.2d 488, 490 (Tex. Crim. App. 1995).  In contrast, the prejudice prong is
determined under current law.  Ex
parte Butler, 884 S.W.2d 782, 784 (Tex. Crim. App. 1994)

 








B. 
ApplicationCIneffective Assistance of
Counsel

1. 
Lack of Recorded Voir Dire

Why counsel failed to request a record of voir
dire does not appear in the record, and hence the first leg of the Strickland
ladder collapses.[2]  Further, while Reyna postulates that the
failure to record voir dire prevented an appeal regarding any Batson
challenges, he presents us with no evidence that any Batson violation
occurred, let alone one warranting a successful appeal.  Without showing some identifiable error
resulting from the absence of the record, the second leg of the Strickland
ladder also fails along with his attempt to scale the Strickland ladder.

2. 
Failure to File a Motion to Suppress








It is axiomatic that Reyna must have standing to
file a motion to suppress, that is, that his privacy rights were violated.  See State v. Klima, 934 S.W.2d
109, 111 (Tex. Crim. App. 1996).  Reyna
asserts that the shell casing found during the search of Cerda=s car
should have been the object of such a motion. 
Under the circumstances at issue, standing could be conferred on Reyna
if he was the car=s owner, if it was occupied by
him when it was searched, if he and Cerda were married at the time of the
search, if he had permission from the owner to drive the vehicle, if he had a
legal right over the vehicle, or even if he had permission from a non-owner who
was authorized to permit him use of the vehicle.  See Parker v. State, 182 S.W.3d 923,
927 (Tex. Crim. App. 2006).  There is no
evidence in the record of the foregoing. 
In fact, the trial court determined that Reyna and Cerda did not have a
common law marriage.  Accordingly, we
hold that Reyna had no standing to contest the search of Cerda=s
car.  Therefore, Reyna cannot establish
that his counsel=s decision not to file the
motion to suppress was erroneous.

3. 
Cumulative Error

Because we have found no error regarding voir
dire or the failure to file a motion to suppress, there is no error to
accumulate.  

We overrule Reyna=s first
three points.  

IV.  Jail
House Correspondence

Reyna=s fourth
point contends that the trial court erred by admitting certain irrelevant jail
house correspondence from Reyna over his objection.  The correspondence consists of two pages of
writing and a one-page drawing of a topless woman and was written by Reyna and
sent to Luis Gongora.

Specifically, Reyna=s
attorney=s
objection was as follows:  








Judge, this is a
jailhouse letter.  It contains some
artwork which I would say is not relevant to this case.  It also contains a bunch of expletives and a
bunch of screwed up language that doesn=t prove anything that they haven=t already proved
elsewhere, so its probative value is very low and its prejudicial effect is
very high. 

 

As pointed out by Reyna, the trial court is given
broad discretion in determining preliminary questions regarding the
admissibility of evidence.  Butler v.
State, 936 S.W.2d 453, 458 (Tex. App.CHouston
[14th Dist.] 1996, pet. ref=d).  There must be a Adirect
or logical connection between the offered evidence and the proposition to be
proved.  So long as there is any
reasonable logical nexus, the evidence will pass the relevancy test.@  Id. (citing Fletcher v. State,
852 S.W.2d 271, 276-77 (Tex. App.CDallas
1993, pet. ref=d)).

Also, as pointed out by the State, the appellate
court reviews a trial court=s
admission or exclusion of evidence under an abuse of discretion standard.  Burden v. State, 55 S.W.3d 608, 615
(Tex. Crim. App. 2001); Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim.
App. 1996) (op. on reh=g); Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).  Only if the court=s
decision falls outside the zone of reasonable disagreement, has it abused its
discretion.  Rankin, 974 S.W.2d at
718; Montgomery, 810 S.W.2d at 391.








We first observe that the objection points with
specificity of any sort only to the irrelevant Aartwork@ and to
a Abunch of
expletives@ and invokes a Rule 403
objection that the prejudicial effect of the correspondence is outweighed by
its probative value.  Bearing in mind
that the State=s theory in the case was that
the shooting was gang related, recalling that there was testimony that the
deceased flashed gang signs to the shooter=s car
before she was shot, and noting that the correspondence, even including the Aartwork@ page,
is replete with gang references, we cannot say that the trial court abused its
discretion by admitting the correspondence over the relevance objection.  Furthermore, even Reyna conceded that the
letter=s
contents did not prove anything beyond that which the State had already proven;
accordingly, any prejudice stemming from the language in the correspondence was
minimal because the jury was already well aware of Reyna=s
alleged gang affiliations through testimony of numerous witnesses and other
evidence.  Accordingly, we cannot say
that the probative value of this letter was outweighed by the potential for
prejudice.  

Further, even if error had occurred in its
admission, it was most assuredly harmless. 
The appropriate standard of harm for the wrongful admission of unfairly
prejudicial evidence is found in Texas Rule of Appellate Procedure
44.2(b).  Reese v. State, 33
S.W.3d 238, 243 (Tex. Crim. App. 2000). 
Because the error complained of involves non-constitutional error, it is
to be disregarded unless it affected Reyna=s Asubstantial
rights.@  Tex.
R. App. P. 44.2(b).








A substantial right is affected when the error
had a substantial and injurious effect or influence in determining the jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  The conviction is to be affirmed if, after
examining the record as a whole, the court is left with fair assurance that the
error did not influence the jury or influenced the jury only slightly.  Solomon v. State, 49 S.W.3d 356, 365
(Tex. Crim. App. 2001).  In assessing the
likelihood that the jury=s decision was adversely
affected by the error, the court is to consider everything in the record,
including any testimony or physical evidence admitted, the nature of the
evidence supporting the verdict, and the character of the alleged error and how
it might be considered in connection with other evidence in the case.  Motilla v. State, 78 S.W.3d 352, 355
(Tex. Crim. App. 2002).  The court may
also consider the jury instructions, the State=s
theory, and any defensive theories, closing arguments, and even voir dire, if
applicable.  Id.

Following an examination of the entire record, we
hold that the correspondence could not possibly have had a substantial or
injurious effect or influence on the jury=s
verdict and was clearly harmless.  We
overrule Reyna=s fourth point.

V. 
Conclusion








Having overruled all four of Reyna=s
points, we affirm the judgment of the trial court.

 

PER
CURIAM

 

PANEL F:    MCCOY,
J.; CAYCE, C.J.; and LIVINGSTON, J.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: September 7,
2006

 

 

 











[1]See Tex.
R. App. P.
47.4.





[2]See, e.g., Whitney v.
State,
190 S.W.3d 786, 788 (Tex. App.CFort Worth 2006, no pet.) (AHere, there is no record
of the proceedings against Whitney, and Whitney failed to file and secure a
hearing on a motion for new trial.  The
record is silent regarding why Whitney=s trial counsel failed to request a record . . .
.  Thus, we hold that Whitney failed to
meet the first prong of Strickland.@)